UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN SANNITI, | ) | CASE NO.1:23CV2118 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, OHIO | ) | OPINION AND ORDER |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

<u>CHRISTOPHER A. BOYKO, J:</u>

This matter is before the Court on Defendants City of Cleveland's and Cleveland Police Department's Motion for Summary Judgment.  (ECF # 26).  For the following reasons, the Court grants Defendants' Motion.

<u>Background Facts</u>

Plaintiff Steven Sanniti brings this action alleging an unlawful search and seizure in violation of his Fourth and Fourteenth Amendment rights along with state law claims for Intentional Infliction of Emotional Distress and Trespass.  According to his Complaint, Plaintiff alleges that on or about July 10, 2022, at 1:30 a.m., officers with the Cleveland Police Department appeared at his residence at 3135 West 98th Street in Cleveland, Ohio.[1]  Plaintiff's estranged son Anthony contacted police and alleged that Sanniti was withholding Anthony's

---

[1]  On summary judgment the parties agree the events in question occurred on July 11, 2022.

personal property within the 3135 residence.  Plaintiff alleges that his son never resided at the 3135 residence but officers on the scene demanded that Plaintiff open the door to allow Anthony to enter the house and retrieve his personal property.

After officers allegedly threatened Plaintiff with having the door kicked down and seeing officers outside with guns drawn, Plaintiff opened the door.  Upon opening the door, Plaintiff claims he was immediately pinned to a wall while seven officers proceeded inside the residence. Police searched the residence, allowed his son access to the same and remained for ten minutes, taking nothing.

Plaintiff  alleges these violations were also the product of the City of Cleveland's improper training of its officers and deficient supervision.  Moreover, the unlawful Fourth Amendment violation was the result of a policy of the City of Cleveland and demonstrates a deliberate indifference to constitutionally required training standards.

**Defendants' Motion for Summary Judgment**

According to Defendants, Plaintiff's claims against the Cleveland Police Department fail because the Department is not *sui juris* as a matter of law.  Moreover, the evidence before the Court demonstrates there was no unlawful entry nor was there an unlawful seizure.  Plaintiff has failed to adequately plead any *Monell* theory other than an unlawful custom or policy claim. Plaintiff cannot produce evidence showing that a custom or policy of the City of Cleveland was the moving force of any alleged unconstitutional search or seizure.  Nor has Plaintiff produced any evidence that Cleveland's police officer training is inadequate for the tasks and has not produced evidence that a failure in supervision resulted in any constitutional violation.  Finally, regarding Plaintiff's *Monell*  claims, Plaintiff failed to show the City was deliberately indifferent

given its extensive training of its officers.

According to Defendants, Plaintiff has failed to assert a constitutional violation claim against an individual officer and an action for a Fourth Amendment violation cannot be maintained against a municipality directly.

Also, Defendants contend Plaintiff's state law claims for Trespass and Intentional Infliction of Emotional Distress fail because the City is immune from liability under O.R.C. § 2744.02(A)(1).   Even if not immune, Plaintiff has failed to produce evidence sufficient to show Defendants conduct rose to the level of an intentional infliction of emotional distress or constituted a trespass under Ohio law.

Lastly, Defendants assert that Cleveland is immune from punitive damages for any § 1983 violations.

**Plaintiff's Opposition**

Plaintiff contends that the City of Cleveland's police officers coerced and threatened Plaintiff to open his door and allow them access to his house even though there was no suspicion or probable cause that he had committed or was committing a crime.  Nor did they have any reason to believe his son Anthony was a resident.   As a result, his consent was non-voluntary and Defendants are liable under *Monell* for the Fourth Amendment violation based on an unlawful custom or policy and for failure to properly train and supervise their officers. Moreover, the lack of training demonstrates a deliberate indifference to Plaintiff's constitutional rights.

3

## LAW AND ANALYSIS

### Standard of Review

Summary judgment shall be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy. Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A), (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hospital Ass 'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the

4

necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distributors Benefits Ass 'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

### ***Sui Juris* and Cleveland Police Department**

Defendants argue that a municipal police department is not *sui juris* or subject to suit. There appears to be no real dispute that municipal police departments are not subject to suit. See *Marshall v. Toledo Police Dep't,* No. 3:23 CV 2054, 2024 WL 3819624, at *2 (N.D. Ohio Aug. 14, 2024) ("Defendants are correct that the City of Toledo "Police Department" is not sui juris, that is, not an entity subject to suit under § 1983.) *Marshall v. Toledo Police Dep't,* No. 3:23 CV 2054, 2024 WL 3819624, at *2 (N.D. Ohio Aug. 14, 2024); *Lawson v. City of Youngstown,* 912 F. Supp. 2d 527, 531 (N.D. Ohio 2012) (holding that police departments are not sui juris for purposes of suit under § 1983); see also *Tysinger v. Police Dep't of Zanesville,* 463 F.3d 569, 572 (6th Cir. 2006) ("We note at the outset that the named defendant in this action, the Police Department of the City of Zanesville, is not a juridical entity subject to suit under Ohio law."); *Lloyd v. City of Streetsboro*, 2018 WL 11298664, at *3 (6th Cir. Dec. 20, 2018)) ("We have held that, under Ohio law, sheriff's and police departments are not entities capable of being sued under § 1983.").

"Courts routinely grant police departments' motions for summary judgment (as well as motions to dismiss and motions for judgment on the pleadings) on this basis." *Marshall*, 2024

WL 3819624 at #2.   See, e.g., *Greenlee v. City of Cleveland*, 2005 WL 2249920, at *7 (N.D. Ohio) ("As Defendants properly noted in their summary judgment motion, police departments are not sui juris entities – that is, they are not capable of being sued as a matter of law..." *Mason v. Holmes*, 2014 WL 696418, at *11 (N.D. Ohio) (granting summary judgment to police department because "[a] municipal police department is an administrative unit of a local government and as such is not sui juris because it lacks the power to sue, and cannot be sued absent positive statutory authority.."). See also *Deir v. Lake County*, 2012 WL 1142467 (N.D.Ohio April 4, 2012)

There being no question that the Cleveland Police Department is not *sui juris*, the Court grants Cleveland's Motion for Summary Judgment on all Plaintiff's claims against the Department.[2]

**42 U.S.C. § 1983 Claim**

To maintain a claim under § 1983, a plaintiff must establish that he or she was deprived of a right secured by the Constitution or the laws of the United States, and that the deprivation was caused by a person acting under color of state law. See *West v. Atkins*, 487 U.S. 42, 48 (1988); *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir. 1991). The Supreme Court has interpreted the word "person" broadly; and certain local governmental units, including municipalities, are considered persons for purposes of § 1983 liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred."

---

[2]  Plaintiff asked the Court for Leave to Amend his Complaint to remove the Cleveland Police Department and to substitute an individual officer. The Court has addressed that Motion in a separate opinion.

*Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). The first step in any such claim is to identify the specific constitutional right allegedly infringed. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140. The parties do no dispute that on the night in question, officers were acting under the color of law.

Plaintiff asserts he suffered a Fourth Amendment violation when Cleveland police officers entered his home under threat of breaking down his door, conducted an unlawful search and restrained him from leaving his home.

Although "person" has been given a wide meaning under § 1983, when the person is a municipality, liability attaches only under a narrow set of circumstances: "A municipality may not be held liable under § 1983 on a *respondeat superior* theory—in other words, 'solely because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691).

## Unlawful Search and Seizure

Plaintiff expressly disclaims he is bringing a direct Fourth Amendment violation claim against the City of Cleveland. (ECF # 27 pg. 22). However, in order for Plaintiff to successfully assert a *Monell* claim against a municipality there must be an underlying constitutional violation. "There can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas,* 753 F.3d 606, 622 (6th Cir. 2014).

The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or

7

things to be seized." U.S. Const. amend. IV. "The Fourth Amendment protects against

unreasonable searches and seizures. Government entry into a private home is considered a

search implicating the Fourth Amendment. *O'Donnell v. Brown,* 335 F. Supp. 2d 787, 801

(W.D. Mich. 2004) citing *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111

L.Ed.2d 148 (1990); *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d

639 (1980); *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125,

3134, 32 L.Ed.2d 752 (1972) ("physical entry into the home is the chief evil against which the

wording of the Fourth Amendment is directed"). "However, there are a few well-defined and

carefully circumscribed circumstances in which a warrant will not be required." *Thacker v. City

of Columbus,* 328 F.3d 244, 252 (6th Cir. 2003).

"The well-delineated exception at issue here is consent. If an officer obtains consent to

search, a warrantless search does not offend the Constitution." *United States v. Moon,* 513 F.3d

527, 537 (6th Cir. 2008) citing *Davis v. United States,* 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90

L.Ed. 1453 (1946). Indeed, "[a]n officer with consent needs neither a warrant nor probable cause

to conduct a constitutional search." *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir.1996).

"Such consent, however, must be voluntary and freely given." *Moon,* 513 F.3d at 537 *citing

Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Consent is

voluntary when it is "unequivocal, specific and intelligently given, uncontaminated by any duress

or coercion." *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977). The Government has

the burden to prove that the consent was voluntary and "must be proved by clear and positive

testimony." *United States v. Scott,* 578 F.2d 1186, 1188–89 (6th Cir.1978). "When seeking to

justify a search based on consent, the government has the burden of showing by a preponderance

8

of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Bueno,* 21 F.3d 120, 126 (6th Cir.1994) quoting *Bumper,* 391 U.S. at 548.

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973), see also *United States v. Ivy,* 165 F.3d 397, 402 (6th Cir.1998). "As part of this inquiry, we consider the circumstances surrounding the search for "more subtle forms of coercion that might flaw [an individual's] judgment." *Moon*, 513 F.3d at 537.

Defendants argue that a review of the recorded video of the incident clearly shows Plaintiff consented to officers entering his home on the day in question, therefore, no constitutional violation occurred. Plaintiff sees the video very differently, asserting that he only opened the door after officers yelled and threatened to have Plaintiff's son kick in the door. It was only due to the officer's threats that Plaintiff consented to opening the door.

A review of the police body camera footage shows officers outside the 3135 house when police supervisor, Sergeant Michael Keane, arrived at approximately 3:28 on Keane's body camera. As he approaches the house, an officer is standing at the foot of the front stairs and another man, Anthony Sanniti, Plaintiff's son, is sitting on the front steps. Both the officer and Anthony inform Keane Anthony has clothes and car keys inside the house. At 3:29 on Keane's body camera Keane approaches the front door where Plaintiff stands inside the house behind the locked front door. Keane announces he is the supervising officer requested by Plaintiff in a 911 call. Keane then asks if Anthony lives in the house and Plaintiff states "no he does not."

Plaintiff informs Keane that Anthony assaulted him earlier in the day.  Keane responded that Anthony would not assault Plaintiff while the officers were there and asks Plaintiff to let Anthony get his clothes and keys and they would be on their way.  Plaintiff denies that Anthony has any possessions in the house.   Keane then talks to Anthony who says he has his work ID, work clothes, clothes and keys in "my room" which is upstairs in 3135.  Anthony further states his clothes were already boxed up.  An officer approaches Keane and Anthony and confirms the truck parked outside is registered in Anthony's name.  Anthony then informs officers that the 3135 house is not in Plaintiff's name.  Plaintiff then reiterates he will not open the door.

At this point, approximately 3:34, Keane asks Anthony if he is going to open the door.  Anthony responds that he does not have a key.  Keane then implies Anthony should force open the door because " its your house.  You have as much right to it as he does."  Keane then walks back to the front door and tells Plaintiff, "when ___**HE**___ ( Anthony) comes in you back away from him and have a seat."  (Emphasis added).  Keane then informs Plaintiff Anthony is going to kick in the door to which Plaintiff responds again that Anthony does not live there.  Keane then demands that Plaintiff, "open the door!"  When Plaintiff tells officers he is on the phone Keane states, "I couldn't care less.  Open the door!"   Keane then says, "I'm done playing with you. Open the door!"  "Hurry up," "we are done playing games" "we have half the goddamned police department here." Plaintiff then says he is trying to protect himself to which Keane responds "there are six police officers here.  We can protect you" "hurry up."  At no point in this exchange does Keane state that any of the police officers intend on entering the residence, only Anthony.

10

Approximately two minutes then pass [3] while Plaintiff is on the phone with a friend and appears to be removing screws he used to secure the door.  He then unlatches the door and tells officer Keane "Ok sir I want to talk to you guys" "please, want to step in here and I will speak to you."  Officers enter the house slowly while Plaintiff asks them to talk outside because "I am deathly afraid of this kid."   Keane tells Plaintiff to let Anthony get his things from upstairs to which Plaintiff responds to Keane, "walk up with me and I'll show you.  Please don't let him (Anthony) in the house."   The officers remain with Plaintiff in the front room while Anthony disappears into the house to retrieve his property.  One officer accompanies Anthony into the next room and up the stairs while Anthony retrieves a box from an upstairs bedroom.  Plaintiff asks the officers to protect him from Anthony.  Plaintiff tells officers he evicted Anthony who only started staying at the house for two nights.  Anthony then walked out with a box and keys, exits the house and tells officers he has other items in the house but would work that out later and would not return to the house.   Keane exits the house at approximately 3:41 on his body camera and tells Plaintiff he can lock the door as Anthony won't come back in the house.

Plaintiff makes a number of material misrepresentations belied by the bodycam footage.  First, in his Complaint he alleges he saw officers with guns drawn.  (ECF #1-1,¶ 7).  Five separate body camera videos from the different officers on the scene failed to evidence any officer drawing their gun.  He then alleges that as he was unlocking the door officers forced it open and seven officers rushed in and pinned him to a living room wall and refused to release him on his demand.  (*Id*).  None of these statements are borne out by the body camera footage.

_____

[3] Two minutes under these circumstances is highly relevant and material to determining whether Plaintiff's consent was voluntary.  Plaintiff's statements clearly indicate his initial refusal to consent was to prevent his son from entering, not the officers.

Bodycam X60343610 records a clear view of the door with Keane standing closest to it when Plaintiff opened the door.  At approximately 3:35:33 on this body camera, Keane pulls out a flashlight in his right hand while wearing a right side gun holster.  Keane tries the doorknob at 3:36:39 but releases it as the door was still locked.  At 3:37:24 Plaintiff opens the door and Keane enters first without ever touching the door.  Only four officers enter the house and no one touches Plaintiff or pins him to a wall.  Officers were only in the house for a few minutes and there is no body camera footage evidencing Plaintiff's testimony that he was held in the house against his will, was threatened with arrest if he left the house nor that he sought to leave but was prevented from doing so by the officers.

Based on the totality of the circumstances, the Court finds there was no constitutional violation by officers in entering Plaintiff's home as Plaintiff consented to the officers entry.  The evidence shows officers never threatened Plaintiff with arrest nor did they threaten him with violence or criminal charges.  Officers talked with him at length through the door.  And Keane came to the house at the request of Plaintiff who called and requested a police supervisor come to the home.  In his interactions with Keane, Plaintiff repeatedly expressed his fear of his son Anthony.  Keane responded forcefully, "we can protect you."  Moreover, there was no question that neither the officers nor Plaintiff ever believed the officers were there for any purpose other than to prevent a violent interaction between Plaintiff and his son.  As the video further shows, there was no immediate response by Plaintiff to Keane's demand he open the door.  Rather, nearly two minutes went by before Plaintiff opened the door after Keane shouted at him to open the door.  All the while Plaintiff was talking on the phone to someone else.  Finally, when he opened the door he does not indicate he is only doing so under duress or coercion but instead

12

stated, "Ok sir I **want** to talk to you guys" (emphasis added) "please want to step in here and I will speak to you."   Plaintiff told the officers "please don't let him (Anthony) in the house." Given the time lapse between Keane's order to open the door, the absence of any evidence or indication by the officers that they intended to enter the house, Plaintiff's own statement as he opened the door that he wanted to talk to the officers and his clear invitation to the officers to enter the home, and Plaintiff's repeated statements no to let Anthony in the house, the Court finds that the consent was voluntary.

In circumstances far more ominous, the Sixth Circuit has found valid consent even when an individual was handcuffed, intoxicated and surrounded by armed officers. See *United States v. Perry,* 703 F.3d 906, 909 (6th Cir.2013) (holding that the defendant's consent was voluntary despite the fact that "she was handcuffed when she gave it, that the police were armed, that the police never told her that she could decline to consent, and that she was drunk at the time"). The *Perry* court held that the district court did not clearly err in finding that the defendant's consent was voluntary because she had been arrested (and handcuffed) before and her encounter with the officers "was brief, without any repeated questioning or physical abuse." *Id.*  See also *United States v. Lee,* 793 F.3d 680, 686 (6th Cir. 2015) ("What [the detective] might have done had consent not been given is, of course, irrelevant.")

On the night in question, Plaintiff was not handcuffed nor threatened personally with violence or arrest by Keane.  Plaintiff  also knew he did not have to consent to the officer's entry. Plaintiff testified in his deposition, "You don't have a warrant."  I told them this 20 times at least. "No warrant.  No entry."  (ECF # 24-1 pg 49).

Here, there was no threat against Plaintiff's person, he was not under suspicion of a crime

13

and officers were not seeking to conduct a search of his property. Officers on the scene had reason to believe Anthony resided in the residence given Anthony's statements, the fact that the plates to the car parked outside the residence were in Anthony's name, that Anthony described the items he sought as being in "my room" and Keane's testimony that Anthony had the "light bill" in his name. (ECF #25-1 pg 29). All these provided the officers with a reasonable belief that Anthony resided at the residence and had a legal right to enter it and retrieve his personal property. Moreover, Plaintiff's statements from behind the locked door indicated a fear of Anthony, not the officers, that the officers attempted to alleviate with assurances of protection. However, all this aside, the uncontrovertible evidence shows that Plaintiff voluntarily consented to the search as is clearly shown in the Keane body camera footage.

### *Monell* **claims**

Even if the Court were to find there are genuine issues of fact regarding the voluntariness of the consent, the Court finds Plaintiff has failed to provide any evidence of a *Monell* violation that would permit a jury to find Defendants liable. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). This means that "a municipality can be liable under § 1983 only where its policies are the 'moving force behind the constitutional violation.'" *Id*. at 389 (quoting *Monell*, 436 U.S. at 694). "Municipal liability must rest on a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff; '*respondeat superior* or vicarious liability will not attach under § 1983.'" *Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (quoting *Harris*, 489 U.S. at 385).

The Sixth Circuit has recognized four means by which a plaintiff may show that the

municipality's policies or customs were connected to the constitutional violation: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). Custom and policy are separate and distinct concepts and controlling law requires the Court to analyze them significantly differently. In *Jackson*, 925 F.3d at 829, the Sixth Circuit opined on "policy":

> "[T]o satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.' " *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987)).

> When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an official policy or legislative enactment, the plaintiff must show that there were "formal rules or understandings — *often but not always committed to writing* — that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis added).

> With regard to "custom," the Sixth Circuit in *Jones v. Muskegon County*, 625 F.3d 935,

946 (6th Cir. 2010) stated:

> In this case, where no formal policy exists, the critical question is whether there is a particular custom or practice that " 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.' " *McClendon v. City of Detroit*, 255 Fed.App'x. 980, 982 (6th Cir.2007) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112 at 127 (1988).
> * * *
> "so widespread, permanent, and well settled as to have the force of law." *Kinzer v. City of W. Carrollton*, No. 3:07–cv–111, 2008 WL 3200652, at *5, 2008 U.S. Dist. LEXIS 61203, at *14 (S.D.Ohio Aug. 5, 2008).

15

Plaintiff in his Complaint alleges, "The Defendant's choices in how it performs its legal obligations and duties are policy decisions at issue in the 42 U.S.C. § 1983 and trespass claim." (ECF # 1-1 ¶ 11).  He further alleges "... Defendant CITY as a matter of policy making chose to violate the federal constitutional rights of the Plaintiff..." (*Id)*.  In his Brief in Opposition, Plaintiff fails to point the Court to any policy by the City of Cleveland that was the driving force behind the alleged constitutional violation.  Instead, Plaintiff argues that Keane, as the onsite supervisor, authorized the alleged  unlawful intrusion into Plaintiff's residence and that is sufficient to establish a *Monell* action for an constitutional violation stemming from a municipal policy or custom.

"Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality."  *Miller v. Calhoun Cnty.,* 408 F.3d 803, 813 (6th Cir. 2005 *citing Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).  "Whether a given individual is such a "policymaker" for purposes of § 1983 liability is a question of state law." *Miller* 408 F.3d at 813 citing *Pembaur* 475 U.S at 483.

While a municipality may delegate final policymaking authority, see *Pembaur* 475 U.S. at 483, 106 S.Ct. 1292, it is also true that "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993). "[C]onsideration should ... be given to whether the employee ... formulates plans for the implementation of broad goals." *Hager v. Pike County Bd. of Educ.,* 286 F.3d 366, 376 (6th Cir.2002) (quoting *Faughender v. City of N. Olmsted, Ohio,* 927 F.2d 909, 914 (6th Cir.1991)).

16

Plaintiff contends that Keane was the designated policymaker for the City during the incident in question and that the City may be liable even if the unconstitutional conduct was a one time event.

"The Supreme Court held that a municipality can be liable under § 1983 for a single decision by the municipality's policymakers." *Ruble v. Escola*, 898 F. Supp. 2d 956, 977 (N.D. Ohio 2012) citing *Pembaur,* 475 U.S. at 479–80, 106 S.Ct. 1292.  In determining whether Keane may be considered a final policymaker for *Monell* purposes the Court looks to state law.  The applicable Ohio law, R.C. § 737.06, states: "The chief of police shall have exclusive control of the stationing and transfer of all patrolmen, auxiliary police officers, and other officers and employees in the police department, and police auxiliary unit, under such general rules and regulations as the director of public safety prescribes."  Thus, the applicable Ohio law reveals that the chief of police is subordinate to the director of public safety and it is the public safety director that is the official policymaker absent affirmative evidence that he or she has delegated their authority to another.

The law is clear that the final policy maker is the City of Cleveland Safety Director. Plaintiff offers no evidence that the Safety Director delegated final decisionmaking authority over the City of Cleveland's policy on home entry to Keane and such failure is fatal to his *Monell* claim that there is policy or custom of the City that was the moving force behind Plaintiff's alleged constitutional claim for a Fourth Amendment violation.  See  *Ruble*, 898 F. Supp. 2d at 977 ("Generally, identifying a policymaking official is a question of law for the court to decide, not one of fact to be submitted to a jury;").

Nor has Plaintiff cited the Court to any official policy or any custom that supports a

17

*Monell* violation.  The City provides General Police Order 2.02.02 at ECF # 26-3 pg ID 510

wherein it reads in pertinent part:

> III. Consent Searches
> A. Where an officer seeks consent for a search, the officer shall inform the person,
> in an age appropriate manner, of his or her right to refuse and to revoke consent at
> any time.
> B. A person's consent to search shall be documented using their Wearable Camera
> System (WCS). Officers electing to search by consent may also have the
> consenting person sign the Consent to Search Form (Attachment).
> C. Officers must ensure that an individual is consenting to the search voluntarily.
> Officers shall consider the age, intelligence, education, and authority of the person
> providing consent.
> D. Officers shall not physically or mentally coerce, threaten or exploit an
> individual in order to gain consent for a search.
> E. Third party consents are valid under certain conditions.
> 1. Consent is valid if the third person has common authority over the area to be
> searched.
> 2. Consent to search is not allowed if one cohabitant (roommate) or business
> partner objects to the consent, even if the other person gives permission. Consent
> must be given by both people, if present.

It is clear that the City has a definitive policy safeguarding unlawful entries of its officers

into the homes of private citizens unless consent is given.  Officer Keane had the consent of

Anthony whom he believed was residing in the home in question and ultimately obtained the

consent of Plaintiff.  While Keane never informed Plaintiff of his right to refuse entry, Plaintiff

testified he knew he did not have to consent.

Plaintiff offers no evidence of any pattern or practice of the City of Cleveland permitting,

authorizing or ratifying unconsented to entries by officers into the homes of a private citizen.

Plaintiff has not pointed the Court to such a policy that "established a fixed plan of action to be

followed under similar circumstances consistently over time."  *Pembaur* 475 U.S. 469, 480-81.

Nor does Plaintiff point to any custom or practice of sufficient widespread application to

render the City of Cleveland liable for Keane's actions. Instead, Plaintiff's claims seek to hold the city vicariously liable for Keane's actions for which there is no evidence that it was based on a custom or usage that was permanent and well settled by the City of Cleveland such that it had the force of law.

Therefore, for the foregoing reasons, the Court grants the City's Motion for Summary Judgment on Plaintiff's unlawful policy or custom claim.

**Failure to train**

In his Complaint Plaintiff alleges, "it is obviously clear from this single incident that the Defendant police were not properly trained as required in conducting a field investigation and the law of search and seizure they are sworn to uphold nor supervised by a competent leader of police forces.." (ECF 1-1 ¶10). Plaintiff further alleges "and it is clear was deliberately indifferent to these police training and supervision requirements." (*Id* at 11).

"In order to show that a municipality is liable for [] fail[ing] to train its employees, a plaintiff must establish that: (1) the City's training program was inadequate for the tasks that officers must perform; (2) the inadequacy was the result of the City's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834. "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

In its Motion for Summary Judgment the City of Cleveland argues that Plaintiff has failed to show a genuine issue of fact on failure to train, supervise and deliberate indifference pertaining to a *Monell* claim. According to Cleveland, Plaintiff fails to identify any express inadequacy of

the City's training other than to state in a wholly conclusory manner that training was insufficient

simply because the incident occurred.  As such, Plaintiff's claim must fail because it represents

nothing more than an impermissible attempt to claim *Monell* liability based solely on a

respondeat superior theory.   Plaintiff proffers no evidence that the City of Cleveland's training

was inadequate and Plaintiff himself testified that he did not know anything about Cleveland

police training.  (ECF #24-1, 77:24-78:10).

The City of Cleveland offers the declaration of Lt.Shawn Smith who attests he is in

charge of training for the CPD and Commander of the Ohio Basic Peace Officer Training

Academy ("OPOTA").  (ECF # 26-4 ¶ 3).  Smith attests that the OPOTA training is certified by

the Ohio Peace Officer Training Commission ("OPOTC"), is fully compliant with the Ohio

Administrative Code and is nationally accredited by the Commission on Accreditation for Law

Enforcement Agencies ("CALEA").  Smith declares that all Cleveland Patrol Officers must

graduate from a state approved police academy class.   Officers are trained in state approved

coursework on various topics, including search and seizure.  Once an academy graduate qualifies

for the CPD, they are assigned to a more experienced officer for six months for additional on-the-

job training and must complete regular additional annual training in courses approved by the

federal court since 2019 as part of the Consent Decree.  (*Id* at 7-10).  In addition, Smith attaches

exhibits C1, C2, C3 and C4 showing the additional search and seizure training programs officers

had to complete in 2019, 2020, 2021 and 2022.  Exhibit C5 to his declaration shows that each of

the officers present at Plaintiff's house on July 11, 2022 completed the compulsory coursework

and the years they completed it.   Not only does this show that the officers' training was adequate

but also that the City of Cleveland was not indifferent to its officers training and supervision as it

20

complied fully with the federally mandated training programs. As a result, the evidence demonstrates that Cleveland adequately trains it officers and its training complies with federally approved Consent Decree requirements.

"A failure-to-train claim . . . requires a showing of prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'--- necessary to trigger municipal liability." *Connick*, 563 U.S. at 62. However, "the fact that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Frodge v. City of Newport*, 501 F.App'x 519, 534 (6th Cir. 2012).

Plaintiff offers no witness with the expertise to opine on how the City's police officer training falls below a defined standard despite being compliant with the OPOTC and nationally accredited by the CALEA. Instead, Plaintiff relies entirely on the testimony of Keane that he did not believe he was conducting a search but instead had the permission of a resident. Plaintiff argues "a jury could find only an untrained CPD officer would claim the Fourth Amendment is a long book that he had not read. Only an untrained CPD officer put in charge of what amounts to a police raid team would refuse to agree he is not allowed to enter a private residence in the middle of the night without a search or arrest warrant then force his way into the residence with a threat of violence while claiming how am I supposed to know that Steve Sanniti owns the

property? Because he is behind a locked door? No I have no idea who has more rights to the property." (ECF # 27 pg 20-21) citing (ECF # 25-1 pg 58). This is despite the fact that the training materials offered by Smith do not show how officers are supposed to deal with making a search in a civil matter. Instead the materials show officers are not permitted to enter a residence without a warrant if one resident objects. (ECF #26-4 module 2). According to Plaintiff, a failure to train is evidenced by the conduct of the officers on the night in question and not by their attendance at approved training courses.

In the absence of any expert testimony that the CPD officer training fell below the standard for such training, and without evidence showing how the training officers received was inadequate, Plaintiff has not met the first prong of a failure to train or supervise claim. In fact, Plaintiff frequently argues that the training forbids certain conduct, then says the officers failed to follow that training. And, a single officer's failures do not provide a sufficient basis for *Monell* liability in a failure to train claim. Moreover, a *Monell* claim for failure to train requires Plaintiff provide evidence that the substance of the training was inadequate for the task. *Howell v. NaphCare, Inc.* 67 F. 4th 302, 320 (6th Cir. 2023). Plaintiff fails to point to any substantive training received by the City of Cleveland officers that satisfies this prong. Simply arguing that Keane failed to abide by General Police Orders does not meet this standard.

The deliberate indifference standard "requires that the municipality 'completely disregard' its duty to train." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024) (citing *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023)). As is true here, "where relevant training was given, showing that 'additional training would have been helpful' does not establish municipal liability." *Harris*, 62 F.4th at 1039. "A pattern of similar constitutional violations by

22

untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train."  *Connick,*  563 U.S. at 62.

Given Smith's evidence of instruction on search and seizure procedures and annual additional training, Plaintiff has offered no evidence that creates a genuine issue of fact.  There is no factual dispute that the City engaged in updated and federally approved training in the Consent Decree and Plaintiff offers no evidence that since that time there has been a pattern of similar Fourth Amendment violations by Cleveland Police officers that would have put the City on notice that its training was inadequate.   Plaintiff provides no evidence of prior post-decree incidents that would demonstrate such a pattern.  And as quoted above, even assuming Keane's deficiencies, the law is clear that single officer's failures do not provide a sufficient basis for *Monell* liability in a failure to train claim.

Plaintiff further provides no evidence that any injury he suffered was the result of a policy level failure to supervise.  Here, his Complaint revolves solely around the events in question on July 11, 2022.  Plaintiff points the Court to no evidence that Keane had prior instances of unlawful entry into the residences of private citizens.  There is no evidence of any prior failures to supervise that resulted in a constitutional violation or that there was a causal connection between the City's failure to supervise and Plaintiff's injuries.

Therefore, the Court grants summary judgment for the City on Plaintiff's failure to train and failure to supervise *Monell* claims.

Insofar as Plaintiff alleges that Cleveland ratified the conduct of its officers he proffers no evidence of a final policymaker ratifying any illegal conduct through affirmative approval or failure to investigate.  See *Alsada v.  City of Columbus,* 536 F.Supp.2d 216, 270-71 (S.D. Ohio

2021).    The Court has already determined that Keane was not a final policymaker by law and Plaintiff provides no evidence that the Cleveland Safety Director ratified or was even aware of the officer's conduct on the night in question.  In the absence of such evidence, Cleveland is entitled to summary judgment on all Plaintiff's *Monell* claims.

**Direct Fourth Amendment Claim against Cleveland**

Plaintiff has expressly disclaimed any direct Fourth Amendment claim against the City. (See ECF # 27 pg 22).

**Trespass and IIED**

Plaintiff has failed to oppose the Motion of the City based on its statutory immunity under O.R.C. § 2744.  The Court finds there is no genuine issue of fact and the City is entitled to summary judgment based on immunity under § 2744 and grants summary judgment for the City on Plaintiff's Trespass and IIED claims.

Therefore, for the foregoing reasons the Court grants Defendant's Motion for Summary Judgment on all Plaintiff's claims.

IT IS SO ORDERED.


Date: September 18, 2025          /s/Christopher A. Boyko
                                  CHRISTOPHER A. BOYKO
                                  United States District Judge